UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

TRACY TREST                                                    CIVIL ACTION

VERSUS

AIDS HEALTHCARE FOUNDATION                    NO. 23-01280-BAJ-SDJ

RULING AND ORDER

Before the Court is Defendant AIDS Healthcare Foundation's ("AHF") **Motion for Summary Judgment (Doc. 83)**. Plaintiff opposes the Motion. (Doc. 86; Doc. 97). Defendant filed a Reply Brief. (Doc. 95). For the reasons stated below, Defendant's Motion is **GRANTED IN PART and DENIED IN PART**.

I.     BACKGROUND

This is an employment discrimination case. (Doc. 50). Plaintiff alleges that her former employer, Defendant AHF, discriminated and retaliated against her based on her sex and gender, disability, and age under Title VII of the Civil Rights Act ("Title VII"), the Americans with Disabilities Act ("ADA"), and the Age Discrimination in Employment Act ("ADEA"). (*Id.* at ¶ 17). Plaintiff also alleges that Defendant engaged in reprisal against her in violation of the Louisiana Whistleblower Statute ("LWS").

A. The Business of Defendant.

AHF is a global nonprofit organization providing HIV care and services to those in need. (Doc. 83-1 ¶ 1; Doc. 86-1 ¶ 1; Doc. 83-4 ¶ 4). AHF generates new, innovative

ways of treating and addressing barriers to care for its clients through a network of pharmacies, thrift stores, health and wellness centers, affordable housing locations, and food-service programs. (Doc. 83-1 ¶ 2; Doc. 86-1 ¶ 2; Doc. 83-4 ¶ 4). Founded in 1987, AHF began as a network of hospices committed to fighting for the living and caring for the dying. (Doc. 83-1 ¶ 3; Doc. 86-1 ¶ 3; Doc. 83-4 ¶ 4). Since then, AHF has expanded, turning hospices into healthcare centers, and "building a new paradigm for HIV care both in the United States and around the world." (Doc. 83-1 ¶ 4; Doc. 86-1 ¶ 4; Doc. 83-4 ¶ 4).

AHF operates a facility off of Bluebonnet Road in Baton Rouge, which includes a pharmacy and medical office. (Doc. 83-1 ¶ 5; Doc. 86-1 ¶ 5). AHF's Bluebonnet pharmacy (the "Pharmacy") is managed by the Pharmacy Manager, also known as a Pharmacist-In-Charge or "PIC," the role in which Plaintiff worked for Defendant. (Doc. 83-1 ¶ 6; Doc. 86-1 ¶ 6).

**B. Plaintiff's Prior Work Experience.**

After honorable service in the United States Department of the Navy, Plaintiff worked in pharmacies in Texas, Alabama, and Louisiana for approximately thirty years. (Doc. 86-1 ¶ 1; Doc. 95-1 ¶ 1). After moving from Alabama to Louisiana, Plaintiff applied for job with Defendant. (*Id.*).

**C. Plaintiff's Application and Interview Process with Defendant.**

Plaintiff submitted an application to Defendant. (Doc. 86-1 ¶ 2; Doc. 95-1 ¶ 2). Thereafter, District Pharmacy Director Andrew Killeen and Medical Director Dr. Waref Azmeh interviewed, and ultimately hired, Plaintiff. (*Id.*).

2

### D. Plaintiff's Employment with Defendant.

On June 1, 2021, Plaintiff began employment with Defendant as a Pharmacy Manager or "PIC" in the Pharmacy. (Doc. 86-1 ¶ 3; Doc. 95-1 ¶ 3). Simone Mack worked with Trest as the second pharmacist at the Pharmacy. (Doc. 83-1 ¶ 7; Doc. 86-1 ¶ 7). Later, Mack replaced Plaintiff as the PIC. (*Id.*).

Plaintiff held the PIC position from her hiring in June 2021 through November 22, 2022. (Doc. 83-1 ¶ 6; Doc. 86-1 ¶ 6). Plaintiff excelled as a pharmacist with Defendant, including receiving a salary raise and bonus. (Doc. 86-1 ¶ 22; Doc. 95-1 ¶ 22).

The parties agree that Killeen supervised Plaintiff, but dispute whether Dr. Azmeh also supervised Plaintiff. (Doc. 86-1 ¶ 6; Doc. 95-1 ¶ 6). The parties also dispute whether Dr. Azmeh had control over the Pharmacy. (Doc. 86-1 ¶ 8; Doc. 95-1 ¶ 8).

### E. Ages of Relevant Parties.

Plaintiff was 58 years old when she began working for Defendant. (Doc. 86-1 ¶ 4; Doc. 95-1 ¶ 4). Killeen is 40 years old. (Doc. 86-1 ¶ 2; Doc. 95-1 ¶ 2). Dr. Azmeh is 85 years old. (*Id.*).

### F. Plaintiff's Disability.

Plaintiff was diagnosed with Giant Cell Arteritis ("GCA") by her rheumatologist, Dr. Ronald Ceruti. (Doc. 86-1 ¶ 10; Doc. 95-1 ¶ 10). Plaintiff describes GCA as an "inflammatory condition affecting the blood vessels in [Plaintiff's] neck, head, and eyes." (Doc. 86-1 ¶ 11). Plaintiff explains that GCA causes "flares," meaning

3

instances where the blood vessels in her neck, head, and eyes enlarge. (Doc. 86-1 ¶ 12). During a flare, Plaintiff faces headaches, vision impairment, and potential death. (*Id.*). Plaintiff contends that GCA affects her major life activities of seeing, working, standing, moving, and living. (Doc. 86-1 ¶ 13).

Defendant disputes whether Plaintiff actually has GCA, relying on Dr. Ceruti's deposition testimony. (Doc. 37-26 at 21:18–22:10).

### G. Alleged Workplace Issues.

The parties' briefing focuses on alleged discriminatory conduct in August, September, October, and November 2022. The Court will address the events of each month in turn.

### i.    August 2022 Complaint.

On August 22, 2022, Plaintiff emailed Killeen to describe, in detail, an issue regarding a patient's prescription and co-pay. (Doc. 83-10). Also in that email, Plaintiff described the "adversarial and divisive work environment" that Dr. Azmeh and Jessica Gros, AHF Practice Manager, created for the Pharmacy team (the "August 2022 Complaint").[1] (Doc. 83-10; *see also* Doc. 83-33). Plaintiff stated:

> I am writing this email to inform you about the most recent events that involve the office manager , Jessica Gros , and the Medical Director , Dr. Azmeh. The incidents that I will include go to a larger pattern of bullying by Jessica Gros and has created a very hostile work environment for me and all of my staff. Jessica Gros leverages a close relationship with Dr Azmeh , which has allowed her behavior to go unchecked and has created an adversarial and divisive work environment for the pharmacy team. I can not remain silent any longer and must ask that measures be taken to remedy the situation .

---

[1] Beth Sincere, Plaintiff's co-worker, heard the phrase at the Pharmacy, "Dr. Azmeh is God and Jessica is the voice of God." (Doc. 86-1 ¶ 9; Doc. 95-1 ¶ 9).

(Doc. 83-10 at 2).[2]

> After explaining the prescription and co-pay issue, Plaintiff indicated:

> The above 2 examples are my direct experience but go to a larger pattern of behavior that involves everyone in the pharmacy. and creates a hostile and divisive environment. Simone has had Jessica say that there is no accountability in the pharmacy when she sought clarification regarding a patient's medication. Both Dr. Azmeh and Jessica have directed operational complaints regarding the pharmacy in an aggressive and insulting way that has created stress and distress for Simone.

(*Id.* at 3).

Plaintiff also described her concern regarding a phone call that Dr. Azmeh allegedly made to Killeen on August 18, 2022, in which Dr. Azmeh allegedly stated that he did not like the way that Plaintiff talked to his staff. (*Id.*). Thus, Plaintiff stated:

> I am a decorated veteran of Desert Storm and have been a pharmacist for over 20 years. I have never , in this time frame, had my professional reputation and/or performance questioned . Per our conversation, I understand that Dr. Azmeh stated to you that he did not like the way I talked to his staff. I am going to ask for proof of that accusation. I have a right to ask documentation of who, when and discussions with me that Dr Azmeh has had or observed directly. That will not be forthcoming as it does not exist. If Dr. Azmeh is referring to the incident with Jessica, he was not present at either interaction I had with her on Wednesday. He has not spoken to me at all to hear my side things. He has gone to my supervisor with untruths and one sided representation. This falls squarely in category of defamation of character and libel/slander. This is detrimental to my professional reputation that is unfounded. I will not let that stand! have retained legal council regarding these issues in the hope that it is overkill and not needed.I am more than happy to communicate with both them regarding patient care as long as the communication is bilatterally respectful and professional. However , I do want a sustained change in the way the pharmacy staff is treated by these two individuals, I want the accusation against me either proven or retracted both verbally and in any written communication it has

---

[2] The text included in each of the communications throughout this Ruling are copied verbatim from the documents in the record.

appeared in and do not want any perceived retaliation against myself or my team because I am voicing these concerns. If this cannot be accomplished , I will escalate to an official HR complaint and/or pursue this legally outside of AHF.

(*Id.* at 3–4).

After Plaintiff's August 2022 complaint, Dr. Azmeh did not speak to Plaintiff regarding patient care or Pharmacy operations. (Doc. 83-1 ¶ 19; Doc. 86-1 ¶ 19). Instead of speaking with Plaintiff, Dr. Azmeh spoke to Mack regarding patient care and Pharmacy operations. (Doc. 83-1 ¶ 20; Doc. 86-1 ¶ 20).

### ii.    September 2022 Incident.

On the morning of September 2, 2022, Trest emailed Killeen, stating that she submitted a request for vacation time from September 30 to October 7, 2022. (Doc. 83-1 ¶ 27; Doc. 86-1 ¶ 27). Killeen responded: "Is there any flexibility with your dates? This is the exact same time everyone will be in Los Angeles training for ScriptMed so we don't have anyone to fill in." (Doc. 83-8 at 4). Throughout the day, Plaintiff and Killeen exchanged several emails and text messages regarding Plaintiff's request for vacation time. (Doc. 83-8; Doc. 83-9 at 111–117). Over text message, Killeen explained that he understood Plaintiff's frustration regarding the vacation request, but stated, "I just don't have a lot of options or wiggle room." (Doc. 83-9 at 112).

Later, on September 15, 2022, Killeen emailed Trest:

Roshy and I have tried all options to find you covered but all of our resources are unavailable with [] training. We could offer [Mack] remote help (Bobbi [Crouch] will be busy all week too for [the training]) or we can move it 1 week further and have coverage. What would you both like to do?

6

(Doc. 83-8 at 7). Plaintiff responded:

> I appreciate that! I am going to withdraw my request. I cancelled my plans when you said there was no coverage previously. Looking at my timeline of things we need to do for the rollout [], I think it will be in everyone's best interest to just cancel the request. I really appreciate both you and Roshy trying to cover it. That means a lot!

(*Id.* at 6–7). In her briefing, Plaintiff contends that she was forced to rescind her vacation request due to allegedly insufficient coverage for the days she would be on vacation leave, but argues that she had worked alone in the Pharmacy while Mack was on vacation on a previous occasion. (Doc. 86-1 ¶ 30).

Defendant submitted an Excel report showing each of Plaintiff's time off requests and the resolution of same. (Doc. 83-29; Doc. 91). It is undisputed that apart from one other request in July 2022 that is not an issue in this case, Killeen approved every single one of Plaintiff's requests for time off, including those after her September 2, 2022 request. (Doc. 83-1 ¶ 34; Doc. 86-1 ¶ 34). Plaintiff qualifies that she sent two follow-up inquiries regarding a June 2022 vacation request that went unanswered but otherwise admits this fact. (*Id.*).

Also on September 2, 2022, in the same email thread titled "Vacation 09.30-10.07," Plaintiff requested time off to attend doctor's appointments on September 6, 7, and 30, 2022. (Doc. 83-1 ¶ 35; Doc. 86-1 ¶ 35). Responding to an email in which Killeen explained the distinction between sick time and paid time off, Plaintiff stated:

> I will take a look at my sick time... I have been working with a major flare of my Giant Cell Arteritis and one of my eyes is completely shut. I am having a pet scan on Tuesday and may take a few days. I have no

7

vision in my right eye and chest pain. Being evaluated for GCA necrosis in my AAA and military disability. Will keep you updated.

(Doc. 83-8 at 2). In the next hour and a half, Plaintiff sent another email to Killeen stating that she needed to go to the "retinologist" in New Orleans, and as a result, Plaintiff requested to take off work the following Monday through Wednesday, September 5 through 7, 2022. (*Id.*).

Killeen responded, "Since this is outside of our PTO policy, I will not be able to provide coverage." (*Id.* at 1). Plaintiff responded that she was "taking sick time" and would let Mack know. (*Id.*). Killeen responded, "I understand you are upset about your vacation request but I feel this is not appropriate behavior. PTO requests are just that, requests. I will try to find [Mack] remote help while you are out but it will be unscheduled sick time in ADP." (*Id.*). While Killeen initially stated in his email to Plaintiff that her request would be identified as "unscheduled sick time," those days were in fact coded as "Scheduled Sick" days, meaning that Plaintiff was fully paid for those days. (Doc. 83-6 at 4, 7).

Also on the same day, September 2, 2022, Plaintiff texted Killeen: "I am having surgery tomorrow. About to have an aneurysm. Not going to wait, so will keep [you] posted[.]" (Doc. 83-9 at 113). In response to a series of text messages from Plaintiff raising concern about how to handle the process of properly recording her sick time, Killeen texted Plaintiff: "Things come up and that's why we have sick pay. This was just brought up right after we were talking about your vacation time so I didn't understand the urgency but please take care of yourself[.]" (*Id.* at 116). Killeen also told Plaintiff: (1) "[P]lease take the time you need and I'll check in on you in a couple

8

days for a game plan. Don't worry about work"; (2) "[F]ocus on your health. We can figure it [whether Plaintiff needed to complete an official form for sick time] out later"; and (3) when Plaintiff continued to ask, "I will send you the attendance policy but I don't think this is a priority right now." (*Id.* at 113–17).

Then, on September 7, 2022, Plaintiff sent a text message to Killeen stating, "I will be back at work tomorrow. I have my doctor release form." (*Id.* at 117).

Later on September 7, 2022, Killeen asked Plaintiff if she was at work on August 29, 2022. (*Id.*). Plaintiff stated that she was at work, but left early. (*Id.*). The two exchanged the following messages, with Killeen's texts in dark gray and Plaintiff's in light gray:

I did leave early

At what time? I was never notified nor was anything put into ADP

I thought I did put it in. I left around 12:15

I came in at 7:50

I am sorry i was not well and had pounding headache for a week. My right eye was swollen and obviously had other health issues at play. My apologies

I have to reach out to HR since you were paid for time you did not work

I understand and apologize for the inconvenience

You are expected to work your shift. Any variations from that must be reported and approved

Okay

9

(Doc. 83-9 at 118).

In this litigation, Plaintiff argues that Killeen disciplined Plaintiff for leaving work early on August 29, 2022, threatened future discipline for "further incidents" if she did not "check with him" before leaving work, and threatened that her conduct could be considered abandonment of her job. (Doc. 83-6 ¶ 44). Plaintiff contends that Defendant barred her from leaving work early, including on occasions when she was undergoing a flare and needed treatment, unless Killeen was aware of the "schedule change." (*Id.*). Defendant, contrarily, contends that Killeen's counseling of Plaintiff regarding the August 29, 2022 incident did not constitute a reprimand or formal discipline of any kind. (Doc. 83-1 ¶ 52).

For ease of reference, the Court will summarily refer to the above facts as the "September 2022 incident."

### iii.    Alleged October 2022 Verbal Complaint.

The parties dispute whether Plaintiff made an October 2022 Complaint. Plaintiff relies on her own deposition testimony to assert that she verbally reported Dr. Azmeh's alleged age-based comments to Killeen and Sandyann Munroe of Defendant's Human Resources Department sometime during October 2022. (Doc. 86-1 ¶¶ 85–86).

Defendant filed a Declaration from Munroe attesting that each of her communications with Plaintiff were via email rather than phone call. (Doc. 95-10 ¶ 3). Munroe further attested that whenever an employee calls to make a complaint, it is her process to follow up with the employee via email to confirm the details of the call

so that the content of the call is in writing. (*Id.* ¶ 4). Thus, if Plaintiff had called Munroe, Munroe attests that she would have followed up with Plaintiff via email to confirm the details of the phone call. (*Id.* ¶ 5). Munroe has no record of an October 2022 call or complaint from Plaintiff. (*Id.* ¶ 6). Defendant acknowledges that Munroe received an October 2022 email from Killeen about Plaintiff's complaints. (Doc. 95 at 5).

For ease of reference, the Court will summarily refer to the above as the "Alleged October 2022 Verbal Complaint."

### iv.    November 2022 Complaint.

On November 8, 2022, Plaintiff emailed Killeen and described an incident with Dr. Azmeh as follows:

Dr Azmeh just came into the pharmacy and aggressively told me that I was not to send emails about this issue. I started to state that due to the massive miscommunication about this patient last time I was going to email everything to be clear with everyone. He cut me off rudely and told me that he was giving him a month, which still does not fix the problem. and I was not to email anything else I object to being spoken to in this way in front of my staff . It is unprofessional and bullyish. There is absolutely nothing wrong with emailing that information as I suspect anything I said and did last time was misrepresented by him to others including yourself . When this issue occurred last time you said that I needed to come to you and I am . Do the medical directors honestly have no standards of behavior? I do not ask that he like me. I do not like him. However , I am not allowed, nor would I speak to him that disrespectfully. He is out of line and I am officially complaining about his behavior.

(Doc. 83-11 at 5).

In response, Killeen recommended that Plaintiff seek advice from Human Resources. (*Id.* at 4). Plaintiff responded to Killeen: "I am seeking the advice of my attorney. HR did nothing last time so I will go elsewhere." (*Id.*).

Two days later, on November 10, 2022, Defendant opened an investigation into Plaintiff's Complaint. (Doc. 83-12 at 1). Defendant filed its Human Resources

11

"Investigation Record" into the record of this case. (Doc. 83-12). The Investigation

Record indicates that Theresa Waters-Dunston, Defendant's Associate Director of

Human Resources, conducted the investigation. (*Id.* at 1). Waters-Dunston

interviewed Plaintiff and Pharmacy staff. (*Id.*). The Investigation Record included

the following Summary and Findings:

**Summary and Findings:**
The investigation did not support allegations of unlawful discrimination based on age/hostile work environment as reported by Tracy Trest. However, based on the investigative interviews the investigation does support that there is a culture of hostility (not associated with unlawful discrimination or age), aggression, lack of respect, lack of trust, blame, unprofessionalism and inappropriate conduct and behavior demonstrated by Dr. Azmeh and Jessica directed towards the pharmacist. This behavior is witnessed by the pharmacy technicians and is a pattern of behavior that is ongoing and has created an environment where pharmacy staff remain on edge waiting and anticipating the next outburst by Dr. Azmeh (primarily) or Jessica. This has created a barrier for a mutually beneficial working relationship between the HCC and the pharmacy, as required by AHF on behalf of our patients. Below is a summary of the evidence gathered during the investigation.

(*Id.* at 2).

As a result of the investigation, Waters-Dunston recommended that Defendant

take the following actions:

(1) Have documented conversations with Dr. Azmeh and Gros, including:

(a) making them aware of how their behavior and conduct has created a

negative work environment for the Pharmacy,

(b) reminding them of the Code of Conduct and Employee Conduct and

Workplace policies regarding treating others with dignity and respect,

(c) informing them to immediately stop communicating with Pharmacy

staff by yelling and chastising, and

12

> (d) completing one or more of Defendant's trainings regarding effective communication for employees and effective communication for supervisors;

(2) Remind leadership that Pharmacy has standard operating procedures that must be adhered to, which may clash with Dr. Azmeh's expected outcome; and

(3) Encourage Pharmacy and medical department to have routine meetings to discuss challenges with patient billing, insurance, and medication issues.

(*Id.* at 1).

Plaintiff argues that although Waters-Dunston interviewed Plaintiff, she never offered Plaintiff any remedial options to remedy her working environment. (Doc. 86-1 ¶ 23). Instead, Plaintiff contends that Defendant merely accepted Plaintiff's resignation. (*Id.*).

### H. Plaintiff's Job Search.

By October 2022, Plaintiff was looking for a new job. (Doc. 83-1 ¶ 53; Doc. 86-1 ¶ 53). On October 8, 2022, Plaintiff applied for a pharmacist position with the Ochsner Health System. (*Id.*). On November 10, 2022, just two days after the alleged November 8, 2022 interaction between Plaintiff and Dr. Azmeh, Ochsner offered Plaintiff a pharmacist position. (Doc. 83-1 ¶ 54; Doc. 86-1 ¶ 54). Plaintiff accepted the position at Ochsner on the same day she received it. (*Id.*). Also that same day, Plaintiff notified Defendant of her intent to resign. (*Id.*).

## II.   PROCEDURAL HISTORY

Plaintiff filed suit in the 19th Judicial District Court, East Baton Rouge Parish, Louisiana. (Doc. 1-1). Thereafter, Defendant removed this matter to the Court, asserting federal question jurisdiction, 28 U.S.C. § 1331, and diversity jurisdiction, 28 U.S.C. § 1332. Plaintiff then amended her Complaint. (Doc. 50).

Plaintiff asserts the following claims against Defendant AHF:

(1) gender or sex-based discrimination, harassment, and retaliation under Title VII, 42 U.S.C. § 2000e, *et seq.*;

(2) disability discrimination, harassment, and retaliation under the ADA, 42 U.S.C. § 12112, *et seq.*;

(3) age-based discrimination, harassment, and retaliation in violation of the ADEA, 29 U.S.C. § 623, *et seq.*; and

(4) Reprisal under Louisiana Revised Statutes § 23:967.

(Doc. 50). Plaintiff seeks liquidated damages under the ADEA, punitive damages under 42 U.S.C. § 1981a, attorney's fees, costs, and interest. (*Id.*).

Defendant filed a motion for partial dismissal, seeking to dismiss Plaintiff's whistleblower claim. (Doc. 65). The Court granted the Motion in part and denied it in part, dismissing Plaintiff's claims arising under the Louisiana Whistleblower Statute based on violations of federal law. (Doc. 114). Plaintiff's claim arising under the Louisiana Whistleblower Statute based on alleged violations of state law remains. (*Id.*).

14

### III.   LEGAL STANDARD

A district court should "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Funches v. Progressive Tractor & Implement Co., L.L.C.*, 905 F.3d 846, 849 (5th Cir. 2018) ("This occurs when a party fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.").

For issues on which the movant bears the burden of proof at trial, they "must come forward with evidence which would entitle [them] to a directed verdict if the evidence went uncontroverted at trial." *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1264–65 (5th Cir. 1991). The nonmoving party can then defeat the motion by either countering with evidence establishing a genuine dispute of material fact, or "showing that the moving party's evidence is so sheer that it may not persuade the reasonable fact-finder to return a verdict in favor of the moving party." *Id.* at 1265.

Where the nonmovant bears the burden of proof at trial, the moving party must offer evidence that undermines the nonmovant's claim or point out the absence of evidence supporting essential elements of the claim. *See Lujan v. Nat'l Wildlife Federation*, 497 U.S. 871, 885 (1990). Once the movant shows entitlement to judgment as a matter of law, the nonmovant must bring forward evidence to create a genuine issue of material fact. *Giles v. Gen. Elec. Co.*, 245 F.3d 474, 493 (5th Cir. 2001). "The evidence of the non-movant is to be believed,

and all justifiable inferences are to be drawn in [its] favor." *Darden v. City of Fort Worth*, 880 F.3d 722, 727 (5th Cir. 2018).

## IV.  DISCUSSION

Defendant moves for summary judgment on each of Plaintiff's claims: (1) failure to accommodate under the ADA; (2) hostile work environment under Title VII, the ADA, and the ADEA; (3) disparate treatment under the ADA; (4) retaliation under Title VII, the ADA, and the ADEA; and (4) reprisal under the Louisiana Whistleblower Statute.

As a threshold matter, Defendant argues that Plaintiff's claims are time barred for failure to timely file an EEOC Charge. The Court will first consider the timeliness of Plaintiff's claims, and then turn to the merits of same.

For the reasons below, the Court finds that a genuine issue of material fact precludes summary judgment on Plaintiff's hostile work environment claims under the ADA and the ADEA. The Court finds that summary judgment is warranted in Defendant's favor on the following claims: (1) failure to accommodate under the ADA; (2) hostile work environment under Title VII; (3) disparate treatment under the ADA; (4) retaliation under Title VII, the ADA, and the ADEA; and (5) reprisal under the Louisiana Whistleblower Statute.

### A. Whether Plaintiff's Claims Are Barred for Failure to Timely File an EEOC Charge.

Defendant argues that timeliness is a threshold issue in this case. Defendant asserts that to file under suit under Title VII, the ADA, or the ADEA, Plaintiff must first file a charge of employment discrimination with the EEOC within 300 days of

16

the occurrence of the alleged discriminatory conduct. (Doc. 90 at 27). Because Plaintiff filed her EEOC Charge on August 9, 2023, Defendant argues that this 300-day period extends to October 13, 2022. (*Id.* at 28). Because Plaintiff bases several of her claims on events occurring before October 13, 2022, including the August Complaint, September 2022 Incident, and possibly the Alleged October 2022 Verbal Complaint, Defendant argues that Plaintiff's claims based on those events are untimely and must be dismissed.[3] (*Id.* at 27–28).

Plaintiff disagrees, arguing that her claims are not prescribed under the continuing violation doctrine so long as one harassing act occurs within the 300 days prior to the filing of an EEOC Charge. (Doc. 97 at 36 (citing *Heath v. Bd. of Supervisors for S. Univ. & Agric. & Mech. Coll.*, 850 F.3d 731, 736 (5th Cir. 2017), *as revised* (Mar. 13, 2017)). Plaintiff urges that she need only show one incident of harassment that occurred on or after October 12, 2022, to "reach back" and include all acts of harassment.[4] (Doc. 97 at 37).

Before asserting a claim under Title VII, the ADA, or the ADEA, Plaintiff must exhaust her administrative remedies. 42 U.S.C. § 12117; 42 U.S.C. § 2000e–5(e)(1); 29 U.S.C. § 626(d). Thus, Plaintiff cannot pursue her claims without first having presented an administrative claim to the EEOC. *Butler v. Exxon Mobil Corp.*,

---

[3] The parties do not indicate on which day in October Plaintiff made the alleged verbal complaint, such that it is unclear whether Plaintiff's Alleged October 2022 Verbal Complaint is time barred. Defendant denies that the verbal complaint happened at all. (Doc. 95-10).

[4] The parties appear to dispute whether Plaintiff filed her EEOC Charge on August 8 or 9, 2023, resulting in the 300-day period extending until either October 12 or 13, 2022. Based on the facts before the Court, however, this appears to be a distinction without a difference at this time.

17

838 F. Supp. 2d 473, 484 (M.D. La. 2012) (citing *McClain v. Lufkin Indus., Inc.*, 519 F.3d 264, 273 (5th Cir. 2008)).

The United States Court of Appeals for the Fifth Circuit has emphasized that, in Louisiana, a plaintiff may only recover for acts occurring within the 300 days preceding the date she filed her EEOC charge, unless the continuing violation doctrine applies. *Heath*, 850 F.3d at 736 ("In states like Louisiana that have 'an entity with the authority to grant or seek relief with respect to the alleged unlawful practice, an employee who initially files a grievance with that agency must file the charge with the EEOC within 300 days of the employment practice[.]'") (applying 42 U.S.C. § 2000e-5(e)(1)) (additional citations omitted); *Tucker v. United Parcel Serv., Inc.*, 734 F. App'x 937, 940 (5th Cir. 2018) (describing the continuing violation doctrine).

The continuing violation doctrine distinguishes between "discrete acts that form the basis of traditional discrimination claims" and "continuing conduct that forms the basis of hostile work environment claims." *Heath*, 850 F.3d at 737.

Here, it is undisputed that the November 2022 Complaint occurred within the 300 days preceding Plaintiff's EEOC Charge. Defendant argues that the August 2022 Complaint, September 2022 Incident, Alleged October 2022 Verbal Complaint, and November 2022 Complaint each constitute a "discrete act," while Plaintiff argues that the alleged conduct forms a continuing violation, forming the basis for her hostile work environment claims under Title VII, the ADA, and the ADEA.

18

The Fifth Circuit has emphasized:

> Claims alleging discrete acts are not subject to the continuing violation doctrine; hostile workplace claims are. Hostile environment claims are "continuing" because they involve repeated conduct, so the "unlawful employment practice" cannot be said to occur on any particular day. *Morgan*, 536 U.S. at 115–17, 122 S.Ct. 2061. As long as "an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." *Id.* As one circuit has helpfully described *Morgan*'s reasoning, a plaintiff's hostile environment claim "is based on the cumulative effect of a thousand cuts, rather than on any particular action taken by the defendant," so "the filing clock cannot begin running with the first act, because at that point the plaintiff has no claim; nor can a claim expire as to that first act, because the full course of conduct is the actionable infringement." *O'Connor v. City of Newark*, 440 F.3d 125, 128 (3d Cir. 2006).

*Heath*, 850 F.3d at 737.

Thus, the conduct at issue may constitute a continuing violation to support Plaintiff's hostile work environment claims if the conduct at issue survives the Circuit's three limitations on the doctrine:

> (1) the plaintiff must demonstrate that the separate acts are related;

> (2) the violation must be continuing; intervening action by the employer, among other things, will sever the acts that preceded it from those subsequent to it; and

> (3) the doctrine may be tempered by the court's equitable powers, which must be exercised to honor Title VII's remedial purpose without negating the particular purpose of the filing requirement.

*Tucker*, 734 F. App'x at 940 (citing *Heath*, 850 F.3d at 738; quoting *Stewart v. Miss. Transp. Comm'n*, 586 F.3d 321, 328 (5th Cir. 2009)).

Turning to the first limitation, Plaintiff must demonstrate that the separate acts at issue are related. Plaintiff does not specifically describe why she believes the

19

alleged acts are related in her briefing. (*See generally* Doc. 97). Thus, the Court must determine whether the November 2022 Complaint was "related" to the August 2022 Complaint, September 2022 Incident, and Alleged October 2022 Verbal Complaint, as described in Sections (I)(G)(i)–(iii) above, such that the continuing violation doctrine applies.

After reviewing the facts in detail, the Court finds that Plaintiff's November 2022 Complaint, which focused on Dr. Azmeh's alleged wrongful behavior, is unrelated to the September 2022 Incident regarding Plaintiff's requests for vacation and sick leave and Killeen's response to same. (*See supra* Section (I)(G)(ii)). Thus, any claims based on the September 2022 Incident, as described in Section (I)(G)(ii), are untimely and must be dismissed.[5]

The August 2022 Complaint, Alleged October 2022 Verbal Complaint, and November 2022 Complaint each concern Dr. Azmeh's alleged wrongful behavior. (*See supra* Sections (I)(G)(i), (iii), and (iv)). Thus, the Court finds that these events "relate" to one another, as required under the continuing violation doctrine. *See Stewart*, 586 F.3d at 329 (finding that pre–and post-limitations period incidents "related" to one another when they involved the same type of harassment and were perpetrated by the same manager).

Second, the violations must be continuing, meaning that intervening action by Defendant, among other things, will sever the acts "that preceded it from those subsequent to it." *See Tucker*, 734 F. App'x at 940. The parties do not sufficiently

---

[5] The Court will address the effect of this Ruling on Plaintiff's individual claims within the discussions regarding each claim below.

address this issue. Accordingly, the Court will permit Plaintiff's claims based on the August 2022 Complaint, Alleged October 2022 Verbal Complaint, and November 2022 Complaint to proceed at this time, without prejudice to Defendant's right to offer evidence on this issue at trial.

The Court will now analyze each of Plaintiff's claims in turn.

## B. Failure to Accommodate Under the ADA.

First, Plaintiff alleges that Defendant failed to accommodate her disability under the ADA. "Under the ADA, it is unlawful for an employer to fail to accommodate the known limitations of an employee's disability." *Clark v. Champion Nat'l Sec., Inc.*, 952 F.3d 570, 587 (5th Cir.), *cert. denied sub nom. Clark v. Inco Champion Nat'l Sec., Inc.*, 141 S. Ct. 662, 208 L. Ed. 2d 272 (2020) (internal citations omitted). Plaintiff "must prove the following statutory elements to prevail in [her] failure-to-accommodate claim: (1) [she] is a qualified individual with a disability; (2) the disability and its consequential limitations were known by the covered employer; and (3) the employer failed to make reasonable accommodations for such known limitations." *Id.* (citing *Feist v. La., Dep't of Just., Off. of the Att'y Gen.*, 730 F.3d 450, 452 (5th Cir. 2013)).

Defendant argues that Plaintiff's failure to accommodate claim is time-barred because it is based on the September 2022 Incident. (Doc. 90 at 27). The Court has already found that the September 2022 Incident is not subject to the continuing violation doctrine, such that Plaintiff's claims arising out of the September 2022 Incident are time barred. (*See supra* Section (IV)(A)).

21

Plaintiff admits that the events underlying her failure to accommodate claim occurred in September 2022, more than 300 days before Plaintiff filed her EEOC Charge. (Doc. 97 at 43). Plaintiff attempts to save her failure to accommodate claim, however, by arguing that Defendant failed to engage in the interactive process from September to November 2022 by prohibiting Plaintiff from leaving work early unless Killeen, her supervisor, was aware of the schedule change.[6] (Doc. 97 at 43).

The law is clear that "[f]iling a timely charge is a prerequisite to having an actionable claim." *Pullen v. St. Gabriel Health Clinic Inc.*, No. CV 25-52-JWD-EWD, 2026 WL 499596, at *10 (M.D. La. Feb. 23, 2026) (citing *Santos v. Baton Rouge Water Works Co.*, No. 18-1098, 2021 WL 1227875, at *11 (M.D. La. Mar. 31, 2021) (deGravelles, J.) (quoting *Stewart*, 586 F.3d at 328). The Fifth Circuit has held that "[f]ailure to exhaust is not a procedural 'gotcha' issue. It is a mainstay of proper enforcement of [federal] remedies." *McClain*, 519 F.3d at 272. Consequently, the Circuit has instructed that courts must dismiss any claims where a plaintiff fails to show administrative exhaustion. *See id.* at 273 ("Courts should not condone lawsuits that exceed the scope of EEOC exhaustion, because doing so would thwart the administrative process and peremptorily substitute litigation for conciliation."). Because Defendant allegedly failed to accommodate Plaintiff in

---

[6] Plaintiff argues that, "Defendant's failure to engage in the interactive process continued through her constructive discharge, namely evidenced by [D]efendant's unilateral prohibition on [Plaintiff] from leaving work early, including for instances where she was undergoing a flare and needed treatment *unless Killeen was aware of the 'schedule change.'*" (Doc. 97 at 43 (emphasis added)).

September 2022, outside of the 300-day window, Plaintiff's failure to accommodate claim must fail.

Plaintiff's argument that Defendant failed to engage in the interactive process by requiring Plaintiff to notify Defendant when she planned to leave the Pharmacy early due to a flare does not persuade otherwise. The undisputed evidence shows that apart from one other request in July 2022 that is not an issue in this case, Killeen approved every single one of Plaintiff's requests for time off, including those after her September 2, 2022 request.[7] (Doc. 83-1 ¶ 34; Doc. 86-1 ¶ 34). The record reflects that when Plaintiff took time off from work, Killeen coordinated coverage for the Pharmacy. Thus, Plaintiff's seeming desired accommodation—that she, the Pharmacist in Charge, be permitted to come and go from the Pharmacy without notifying her supervisor—is unreasonable, especially because Plaintiff alleges that Defendant has legal obligations regarding the availability of a pharmacist in the Pharmacy. The law only requires Defendant to make reasonable accommodations. *See E.E.O.C. v. Chevron Phillips Chem. Co., LP*, 570 F.3d 606, 613–14 (5th Cir. 2009) (citing 42 U.S.C. § 12112(b)(5)(a)) ("The ADA provides that the term 'discriminate' includes 'not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . . unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity.'").

---

[7] Plaintiff qualifies this fact by emphasizing that she sent two follow-up inquiries regarding a June 2022 vacation request that went unanswered. (Doc. 83-1 ¶ 34; Doc. 86-1 ¶ 34).

Accordingly, Defendant's Motion is **GRANTED** in this respect. Plaintiff's failure to accommodate claim is **DISMISSED WITH PREJUDICE** as untimely.

## C. Hostile Work Environment Under Title VII, the ADA, and the ADEA.

Second, Plaintiff alleges that Defendant created a hostile work environment under Title VII, the ADA, and the ADEA. (Doc. 97 at 24). "Claims of hostile environment based on sex, age, [] and disability are all recognized forms of discrimination." *Cavanaugh v. Wormuth*, No. CV 22-3333, 2024 WL 894791, at *7 (E.D. La. Mar. 1, 2024) (internal citations omitted); *Dediol v. Best Chevrolet, Inc.*, 655 F.3d 435, 440 (5th Cir. 2011) ("Title VII has long been a vehicle by which employees may remedy discrimination they believe creates a hostile work environment."); *Id.* at 441 ("[A] plaintiff's hostile work environment claim based on age discrimination under the ADEA may be advanced in this court."); *Flowers v. S. Reg'l Physician Servs. Inc.*, 247 F.3d 229, 234–35 (5th Cir. 2001) ("[B]ecause Title VII has been extended to hostile work environment claims, we follow the growing consensus that our harassment jurisprudence be extended to claims of disability-based harassment.").

To establish a *prima facie* case of harassment based on a protected basis, the plaintiff must show: (1) she belongs to a protected class; (2) she was subject to unwelcome harassment; (3) the harassment was based on the protected characteristic; (4) the harassment affected a "term, condition, or privilege" of employment; and (5) the employer knew or should have known of the harassment and failed to take prompt remedial action. *Id.* (citing *Woods v. Delta Beverage Group, Inc.*,

24

274 F.3d 295, 298 (5th Cir. 2001) (additional citations omitted)). Here, Defendant does not appear to dispute that Plaintiff can establish a *prima facie* case, but focuses its argument on whether Plaintiff's evidence supports a finding of severity or pervasiveness sufficient to establish a hostile work environment. (Doc. 90 at 36–38).

To succeed on a hostile work environment claim, Plaintiff must demonstrate that she was subjected to harassment that was so "severe or pervasive" that it altered the conditions of her employment and created an abusive working environment. *Gardner v. CLC of Pascagoula, L.L.C.*, 915 F.3d 320, 325 (5th Cir. 2019); *see also Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 752 (1998).

Factors courts consider to determine whether a hostile environment exists include the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating, and whether it unreasonably interferes with an employee's work performance. *Faragher v. City of Boca Raton*, 524 U.S. 775, 788–89 (1998); *West v. City of Hou., Tex.*, 960 F.3d 736, 742 (5th Cir. 2020); *see also Vidrine v. Broom*, No. CV 18-00538-BAJ-EWD, 2021 WL 1232835, at *2 (M.D. La. Mar. 31, 2021), *aff'd sub nom. Vidrine v. Guillot*, No. 21-30203, 2022 WL 3544396 (5th Cir. Aug. 18, 2022).

Federal discrimination laws, however, are not a general civility code prohibiting all types of harassment in the workplace. *Faragher*, 524 U.S. at 788. Therefore, "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Id.* Likewise, a hostile work environment claim does not

25

protect employees from difficult or demanding managers, harsh language by a supervisor, denial of request for special duty or temporary change to schedule and duty assignments, increased scrutiny, or other routine employment matters that, while upsetting, are not offensive or harassing as in the way necessary to support a hostile environment claim. *Cavanaugh*, 2024 WL 894791, at *8 (internal citations omitted).

Defendant argues that Plaintiff's allegations amount to a few isolated interactions of harassment that lack corroboration, and even if corroborated, are not objectively offensive, pervasive, or severe.[8] (Doc. 90 at 38). Defendant points to the following comments that Plaintiff testified Dr. Azmeh made to her as insufficient to sustain a hostile work environment claim:

(1) Plaintiff "needed to retire;"

(2) Plaintiff would be fired "because [she] was sick too much;"

(3) Plaintiff's eye was "ugly" and Plaintiff "might not want to be at work because the patients might think [she] had an infection;"

(4) It would be better if Plaintiff went on a corporate training trip "because [she] was older and didn't have any kids at home," and that "Simone Mack should not have to do it because she has a baby at home;" and

(5) Giant Cell Arteritis "is a disease old people get."

---

[8] Defendant also argues that Plaintiff's hostile work environment claims are time-barred because they are based on events outside of the 300-day window preceding her EEOC Charge. (Doc. 90 at 35). For the reasons described in Section IV(A), the Court finds that Plaintiff's claims based on Dr. Azmeh's alleged wrongful behavior survive under the continuing violation doctrine.

(*Id.* at 36 (internal citations omitted)).

Plaintiff responds that Dr. Azmeh made continuous discriminatory comments to her two to three times per day for at least three months. (Doc. 97 at 34). Plaintiff contends that these comments include the following:

(1) Being accused of not being well;

(2) Threatened that she was not going to be able to perform her job if she kept having to miss work;

(3) Told that GCA is a disease that old people get and she may want to consider retiring because she was older;

(4) Threatened that her disability was going to get worse as she got older and was already old;

(5) Mocked when her eye was noticeably swollen as a result of her disability and told that her eye was ugly and that she might not want to be at work because patients might think she had an infection;

(6) Told that she needed to retire;

(7) Threatened that she was going to be fired due to absenteeism; and

(8) Accused of being sick too much.

(*Id.* at 34–35). Turning to the alleged frequency of the comments, Plaintiff testified:

> I was getting so frustrated because I felt like *every time I had a flare*, Dr. Azmeh would tell me, like, "You need to retire. You're too old, you're" -- I felt like my job was in jeopardy.

(Doc. 86-2 at 210:21–25 (emphasis added)).

> I feel like the *repeated* subtle threats and pushes of -- of being made to retire because I'm old and because I'm sick, and all of this that I received

27

on, *at least a weekly basis* from Dr. Azmeh, put me in a position at this stage of the game where I felt like my job was in jeopardy.

(*Id.* at 211:18–25 (emphasis added)).

However, what I did receive was *repeated* harassment from Dr. Azmeh, telling me that I was -- I needed to retire, that I -- I was gonna get fired due to absenteeism, that I was gonna get fired because I was sick too much. So certainly, there was that added stress to it. I did not feel secure in my job. Not based -- my -- my performance, I was 100 percent fine with. But the comments and harassment from Azmeh's part certainly made me feel less secure about my job.

(*Id.* at 221:22-222:8 (emphasis added)).

And it was *repeated, repeated, repeated*, that I needed to just think about retiring, and I wasn't well, and *repeated* -- he said, "If you keep having to miss work, you know, you're just not gonna be able to perform this job." Usually yelling and screaming. It was definitely not statements that made me feel secure in my position at AHF.

(*Id.* at 242:16-243:13 (emphasis added)).

Dr. Azmeh, for his part, denies making comments about Plaintiff's age. (Doc. 86-6 at 60:1–13).

Noticeably missing from Dr. Azmeh's alleged comments highlighted by the parties are any comments based on Plaintiff's sex or gender. To establish a hostile work environment claim under Title VII, Plaintiff must show that the alleged harassment she suffered was based on sex or gender, and was so "severe or pervasive" that it altered the conditions of her employment and created an abusive working environment. *Gardner v. CLC of Pascagoula, L.L.C.*, 915 F.3d 320, 325 (5th Cir. 2019); *see also Ellerth*, 524 U.S. at 752. Plaintiff has failed to make such a showing. Although Plaintiff argues that Dr. Azmeh allegedly commented that she was too old to have children at home, and that she had to attend a training because

28

she did not have children at home like her younger co-worker, these alleged comments relate to age rather than gender or sex. Accordingly, Defendant's Motion is **GRANTED** in this respect. Plaintiff's hostile work environment claim under Title VII will be **DISMISSED WITH PREJUDICE.**

Turning to whether Dr. Azmeh's alleged comments rose to the level of creating a hostile work environment based on disability or age, the Court finds that this is an issue for the factfinder. *Alzuraqi v. Grp. 1 Auto., Inc.,* 921 F. Supp. 2d 648, 659 (N.D. Tex. 2013) (finding that a reasonable jury may decide that a hostile work environment existed when plaintiff was called "Taliban" by coworkers multiple times per day, even after repeated requests for his coworkers to stop).

Plaintiff argues that she testified in great detail regarding which comments were made, when they were made, and how often they were made. (Doc. 97 at 26). Defendant, however, takes issue with the fact that Plaintiff's testimony is uncorroborated. (Doc. 90 at 37). Defendant also relies on Dr. Azmeh's testimony, in which he denies making age or disability-based comments to Plaintiff. (*Id.*). Defendant further points to the deposition testimony of other Pharmacy employees, which Defendant argues establishes that while Dr. Azmeh acted abrasively at times, he did not make disparaging remarks about Plaintiff's age or health condition. (*Id.*). Finally, Defendant highlights its Human Resources Investigation Record, which found that Plaintiff's November 2022 Complaint "did not support allegations of unlawful discrimination based on age/hostile work environment as reported by [Plaintiff]." (*Id.* (citing Doc. 83-12)).

Because the Court cannot weigh credibility on summary judgment, and because a reasonable factfinder may credit either Plaintiff's testimony, or that of Dr. Azmeh and other Pharmacy employees, the Court finds that it is appropriate to submit this dispute to the factfinder.

Accordingly, Defendants' Motion is **DENIED** in this respect. Plaintiff's hostile work environment claims based on disability and age under the ADA and the ADEA remain.

### D. Constructive Discharge.

Third, Plaintiff alleges that Defendant constructively discharged her. "Under the constructive discharge doctrine, an employee's reasonable decision to resign because of unendurable working conditions is assimilated to a formal discharge for remedial purposes." *Pa. State Police v. Suders*, 542 U.S. 129, 141 (2004). In other words, constructive discharge is an adverse employment action. *Vidrine*, 2021 WL 1232835, at *4 (internal citations omitted). A constructive discharge claim "entails something more" than mere harassment. *Suders*, 542 U.S. at 147. To establish constructive discharge, a plaintiff must not only "prove [ ] that he was discriminated against by his employer to the point where a reasonable person in his position would have felt compelled to resign. . . . But he must also show that he actually resigned." *Green v. Brennan*, 578 U.S. 547, 555 (2016) (citing *Suders*, 542 U.S. at 148); *see also Vidrine*, 2021 WL 1232835, at *4.

"In the constructive discharge inquiry, the court examines the working environment as a whole, and, to find for the plaintiff, must conclude that the

30

resignation was reasonable under all the circumstances." *Robinson v. Waste Mgmt. of Tex.*, 122 F. App'x 756, 758 (5th Cir. 2004). "This holistic review of the workplace takes into account only the specific conditions imposed by the employer; the subjective state of mind of the employee is irrelevant." *Id.* The Fifth Circuit has "previously identified several factors relevant to constructive discharge, including:

> (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (6) offers of early retirement that would make the employee worse off whether the offer were accepted or not.

*Perret v. Nationwide Mut. Ins. Co.*, 770 F.3d 336, 339 (5th Cir. 2014) (internal citations omitted). "Discrimination alone, without aggravating factors, is insufficient for a claim of constructive discharge, as is a discriminatory failure to promote." *Brown v. Kinney Shoe Corp.*, 237 F.3d 556, 566 (5th Cir. 2001).

For constructive discharge claims, "[t]he environment must be 'something more' than that present in a harassment or hostile work environment claim; a plaintiff must show a 'worse case' harassment scenario, harassment ratcheted up to the breaking point." *Easterling v. Sch. Bd. of Concordia Par.*, 196 F. App'x 251, 253 (5th Cir. 2006) (quoting *Suders*, 542 U.S. at 147–48); *see also Russell v. Parkview Baptist Sch., Inc.*, No. CV 19-760-JWD-EWD, 2021 WL 1147162, at *13–14 (M.D. La. Mar. 25, 2021).

Here, Plaintiff does not argue that she: (1) was demoted; (2) received any type of salary reduction; (3) had her job responsibilities reduced; (4) was assigned menial or degrading work; or (5) was assigned to work for a younger supervisor. *See Russell,*

31

2021 WL 1147162, at \*14. Thus, Plaintiff must demonstrate the final factor for a constructive discharge claim—that she suffered "badgering, harassment, or humiliation" by Defendant such that the "working conditions [became] so intolerable that a reasonable person in the employee's position would have felt compelled to resign." *Id.* (citing *Perret*, 770 F.3d at 338). Defendant argues that Plaintiff cannot make such a showing, particularly because the undisputed facts show that Plaintiff submitted her resignation on the same day she accepted a job offer with Ochsner, underscoring the voluntariness of her decision. (Doc. 90 at 20; Doc. 83-1 ¶ 53; Doc. 86-1 ¶ 53).

Plaintiff responds that Defendant badgered, harassed, and humiliated her beginning approximately six months into her employment until she resigned effective November 22, 2022. (Doc. 97 at 34). In support of her constructive discharge claim, Plaintiff argues that: (1) Dr. Azmeh allegedly made derogatory comments to her about her disability; (2) Defendant systematically targeted Plaintiff to get her to resign through Dr. Azmeh's continuous yelling, screaming, berating, and standing over her; (3) Dr. Azmeh refused to communicate with Plaintiff regarding patient care and Pharmacy operations; (3) Dr. Azmeh circumvented Plaintiff and communicated only with Mack; and (4) Dr. Azmeh falsely accused Plaintiff of misconduct.[9] (*Id.*).

---

[9] Plaintiff also argues that Killeen denied Plaintiff's request for vacation, Killeen failed to accommodate Plaintiff, and Killeen disciplined Plaintiff for requesting a reasonable accommodation. The Court has already found that claims arising out of the September 2022 Incident are untimely, so the Court will not consider these facts at this juncture. *See supra* Section IV(A).

The law is clear that "[d]iscrimination alone, without aggravating factors, is insufficient for a claim of constructive discharge[.]" *Brown*, 237 F.3d at 566. Thus, the key question is whether the "badgering, harassment, or humiliation" passed the high bar of constructive discharge. Having carefully considered the matter, the Court finds that a reasonable juror could not conclude that Dr. Azmeh's alleged behavior— individually or in combination—satisfies the high burden of a constructive discharge claim. Plaintiff's subjective belief that Plaintiff's job was at risk does not persuade otherwise. (Doc. 86-2 at 210:21–25 ("I felt like my job was in jeopardy.")); *see Robinson*, 122 F. App'x at 758 ("This holistic review of the workplace takes into account only the specific conditions imposed by the employer; the subjective state of mind of the employee is irrelevant."). Accordingly, the Court finds that Plaintiff was not constructively discharged. *See Russell*, 2021 WL 1147162, at *14 (granting summary judgment for failure to show constructive discharge); *see also Webb v. Sw. Bell Tel., L.P.*, No. 03-ca-1271, 2004 WL 2905255, at *5 (W.D. Tex. Dec. 16, 2004) ("Plaintiff's evidence of hostility, threats, and yelling by [supervisor], as well as evidence that [supervisor] resorted to confronting her outside a restaurant about a coffee break, changed the designation of certain illness days, blocked her path into his office and apparently bumped her chest with his chest, and visited her home to check whether Plaintiff was actually sick is not sufficient to establish that a reasonable person would have felt compelled to resign in Plaintiff's situation."); *Garrett v. City of Tupelo, Miss.*, No. 1:16-CV-197-DMB-DAS, 2018 WL 3341198, at *12 (N.D. Miss. July 6, 2018) ("Additionally, while it appears Miller would yell at

33

Garrett, there is no evidence this occurred so frequently as to rise to the level of a hostile work environment, much less a constructive discharge."); *Landgraf v. USI Film Products,* 968 F.2d 427, 430–31 (5th Cir.1992) (finding that "substantial harassment" involving "continuous and repeated inappropriate verbal comments and physical contact," did not rise to the level necessary to establish a constructive discharge claim); *Aryain v. Wal-Mart Stores Tex. LP*, 534 F.3d 473, 481 (5th Cir. 2008) ("The poor treatment alleged by [plaintiff] does not reach the level required to establish a constructive discharge claim."); *Brown v. Bunge Corp.,* 207 F.3d 776, 782–83 (5th Cir. 2000) (affirming grant of summary judgment even where employee was demoted and given fewer job responsibilities); *Stephens v. C.I.T. Group/Equip. Fin., Inc.,* 955 F.2d 1023, 1027–28 (5th Cir. 1992) (affirming jury verdict on constructive discharge where plaintiff had been demoted, faced significant reductions in salary and responsibilities, and was repeatedly asked when he planned to quit); *Harvill v. Westward Commc'n, L.L.C.*, 433 F.3d 428, 440 (5th Cir. 2005) (employee's assertions that she was treated "rudely and with general hatefulness," that a man she did not know began taking pictures of her, that a meritless racial harassment charge was brought against her, and that a new supervisor was overheard to state that he would receive a bonus if he ran her off were not sufficient to demonstrate harassment so intolerable that a reasonable employee would feel compelled to resign); *Jett v. Dall. Indep. Sch. Dist.*, 798 F.2d 748, 752, 755 (5th Cir. 1986) (finding no constructive discharge after the plaintiff was demoted "with much sorrow and humiliation" from his job as high school football coach and

transferred to another school), *aff'd in part and remanded in part on other grounds by* 491 U.S. 701, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989); *Chapa v. Wells Fargo, N.A.*, No.11-834, 2014 WL 670816, at *17 (W.D. Tex. Feb. 20, 2014) (granting motion for summary judgment on constructive discharge despite plaintiff's claim that she was badgered, harassed and humiliated by (1) her supervisor's internal reference form indicating he would not re-hire her; (2) "an anonymous call to the Ethics Line alleging that Plaintiff called [her manager] a racial slur"; and (3) "an incident in which a co-worker 'became concerned' with Plaintiff's employment status in response to a comment made by [her manager]"); *Stover v. Hattiesburg Public Sch. Dist.*, 549 F.3d 985 (5th Cir. 2008) (employee's assertions that she was not provided the same career development opportunities, her complaints of discrimination were not investigated, her supervisor exhibited anger and violence, and that she was excluded from prestigious retreats were not sufficient to support a claim of constructive discharge).

Because the Court finds that Plaintiff fails to meet the high burden of constructive discharge, her remaining claims must also fail because she cannot establish an adverse employment action.

### E. Disparate Treatment Under the ADA.

Fourth, Plaintiff asserts a disparate treatment claim based on disability under the ADA.[10] (Doc. 97 at 43). To establish a *prima facie* case of disparate treatment under the ADA, the plaintiff must show that: (1) she had a disability within the

---

[10] Plaintiff states that she does not assert a disparate treatment claim based on sex, gender, or age based on Title VII or the ADEA. (Doc. 97 at 43).

35

meaning of the ADA; (2) she was qualified and able to perform the essential functions of the job; and (3) she suffered an adverse employment action because of her disability. *Bernard v. EDS Noland Episcopal Day Sch.*, 62 F. Supp. 3d 535, 541 (W.D. La. 2014) (citing *Neely v. PSEG Tex., Ltd. P'ship,* 735 F.3d 242, 245 (5th Cir. 2013)). Because Plaintiff cannot establish an adverse employment action, she cannot sustain a *prima facie* case of disparate treatment under the ADA. Accordingly, Defendant's Motion is **GRANTED** in this respect. Plaintiff's disparate treatment claim under the ADA will be **DISMISSED WITH PREJUDICE.**

## F. Retaliation Under Title VII, the ADA, and the ADEA.

Fifth, Plaintiff asserts a retaliation claim under Title VII, the ADA, and the ADEA. (Doc. 97 at 44). "To show an unlawful retaliation, a plaintiff must establish a *prima facie* case of (1) engagement in an activity protected by the ADA[, Title VII, or the ADEA], (2) an adverse employment action, and (3) a causal connection between the protected act and the adverse action." *Butler*, 838 F. Supp. 2d at 495 (citing *Seaman v. CSPH, Inc.,* 179 F.3d 297, 301 (5th Cir. 1999); *Hernandez v. Yellow Transp., Inc.,* 641 F.3d 118, 130 (5th Cir. 2011) (describing similar elements of Title VII retaliation claim)); *Heggemeier v. Caldwell Cnty., Tex.*, 826 F.3d 861, 869 (5th Cir. 2016) (describing *prima facie* retaliation claim under the ADEA) (internal citations omitted).

Because Plaintiff cannot establish an adverse employment action, she cannot sustain a *prima facie* case of retaliation under Title VII, the ADA, or the ADEA. Accordingly, Defendant's Motion is **GRANTED** in this respect. Plaintiff's retaliation

36

claims under Title VII, the ADA, and the ADEA will be **DISMISSED WITH PREJUDICE.**

### G. Reprisal Under the Louisiana Whistleblower Statute.

Finally, Plaintiff argues that the Defendant engaged in reprisal against her in violation of the Louisiana Whistleblower Statute, which provides that:

> A. An employer shall not take reprisal against an employee who in good faith, and after advising the employer of the violation of law:
>
> (1) Discloses or threatens to disclose a workplace act or practice that is in violation of state law.
>
> (2) Provides information to or testifies before any public body conducting an investigation, hearing, or inquiry into any violation of law.
>
> (3) Objects to or refuses to participate in an employment act or practice that is in violation of law.

La. Rev. Stat. § 23:967(A).

Louisiana Courts look to federal Title VII jurisprudence to interpret Louisiana discrimination laws. *Stevenson v. Williamson*, 547 F. Supp. 2d 544, 551 (M.D. La. 2008), *aff'd*, 324 F. App'x 422 (5th Cir. 2009) (citing *King v. Phelps Dunbar, LLP.*, 743 So.2d 181, 187 (La. 1999); *Bustamento v. Tucker*, 607 So. 2d 532, 538, n. 6 (La. 1992); *Wyerick v. Bayou Steel Corp.*, 887 F.2d 1271, 1274 (5th Cir. 1989)). Therefore, the federal analysis applicable to Plaintiff's Title VII claim also governs Plaintiff's state law claims under Louisiana Revised Statutes § 23:967. *Stevenson*, 547 F. Supp. 2d at 551.

Applying federal Title VII standards, Plaintiff's claim under the Louisiana Whistleblower Statute fails. An employee "establishes a prima facie case for unlawful

37

retaliation by proving (1) that she engaged in activity protected by Title VII, (2) that an adverse employment action occurred, and (3) that a causal link existed between the protected activity and the adverse employment action." *Rayborn v. Bossier Par. Sch. Bd.*, 881 F.3d 409, 415–16 (5th Cir. 2018) (citing *Long v. Eastfield Coll.*, 88 F.3d 300, 304 (5th Cir. 1996); *McMillan v. Rust Coll., Inc.*, 710 F.2d 1112, 1116 (5th Cir. 1983)). For the purposes of the Louisiana Whistleblower Statute, an adverse employment action "is defined as 'a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Rayborn*, 881 F.3d at 415–16 (quoting *Ellerth*, 524 U.S. at 761) (additional citations omitted).

Because Plaintiff cannot establish an adverse employment action, she cannot sustain a *prima facie* case of reprisal under the Louisiana Whistleblower Statute. Accordingly, Defendant's Motion is **GRANTED** in this respect. Plaintiff's reprisal claim under the Louisiana Whistleblower Statute will be **DISMISSED WITH PREJUDICE.**

## V. CONCLUSION

Accordingly,

**IT IS ORDERED** that Defendant AIDS Healthcare Foundation's ("AHF") **Motion for Summary Judgment (Doc. 83)** is **GRANTED IN PART** and **DENIED IN PART.**

**IT IS FURTHER ORDERED** that Plaintiff's failure to accommodate claim is **DISMISSED WITH PREJUDICE.**

38

**IT IS FURTHER ORDERED** that Plaintiff's hostile work environment claim based on sex or gender under Title VII is **DISMISSED WITH PREJUDICE.**

**IT IS FURTHER ORDERED** that Plaintiff's disparate treatment claim under the ADA is **DISMISSED WITH PREJUDICE.**

**IT IS FURTHER ORDERED** that Plaintiff's retaliation claims under Title VII, the ADA, and the ADEA are **DISMISSED WITH PREJUDICE.**

**IT IS FURTHER ORDERED** that Plaintiff's reprisal claim under the Louisiana Whistleblower Statute is **DISMISSED WITH PREJUDICE.**

**IT IS FURTHER ORDERED** that Plaintiff's hostile work environment claims under the ADA and the ADEA remain.

Baton Rouge, Louisiana, this 31ST day of March, 2026

**JUDGE BRIAN A. JACKSON**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**